# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

| | |
|---|---|
| POLARIS INDUSTRIES INC., | Civil Nos. 15-4129 (JRT/TNL) |
| Plaintiff/Counter Defendant, | 15-4475 (JRT/TNL) |
| v. | **FILED UNDER SEAL** |
| ARCTIC CAT INC. and ARCTIC CAT SALES INC., | **MEMORANDUM OPINION AND ORDER** |
| Defendant/Counter Claimants. | |

Nathan Louwagie & Samuel T. Lockner, **CARLSON CASPERS VANDENBURGH LINDQUIST & SCHUMAN PA,** 225 South Sixth Street, Suite 4200, Minneapolis, MN 55402, for plaintiff/counter defendant.

Joseph A. Herriges, John C. Adkisson, & Maria Elena Stiteler, **FISH & RICHARDSON PC,** 60 South Sixth Street, Suite 3200, Minneapolis, MN 55402, for defendants/counter claimants.

Polaris Industries Inc. ("Polaris") brings these infringement actions against Arctic Cat Inc. and Arctic Cat Sales Inc. (collectively "Arctic Cat"). Polaris alleges Arctic Cat's Wildcat Trail vehicles infringe on its '449 and '501 Patents for side-by-side all-terrain vehicles.

Polaris has moved to Exclude Certain Expert Testimony of Christopher Bakewell. (Docket No. 212, Case No. 15-4129; Docket No. 320, Case No. 15-4475.) Because Bakewell's opinions are properly supported under Federal Rule of Evidence 702, the Court will deny Polaris's Motions.

## BACKGROUND

This series of patent cases arises from Arctic Cat's alleged infringement of Claim 1 of Polaris's '449 Patent in November 2015 (Case No. 15-4129) and infringement of Claims 1, 10, and 11 of Polaris's '501 Patent in December 2015 (Case No. 15-4475).

The '449 Patent involves the positioning of a generally U-shaped sway bar in side by side off-road vehicles. (Decl. of Joseph A. Herriges in Supp. of Def.'s Opening Claim Construction Brief ("Herriges Decl."), Ex. A, Mar. 31, 2017, Case No. 15-4475, Docket No. 137.) The '501 Patent involves the placement of air inlets relative to a continuously variable transmission engine in side by side off-road vehicles. (Herriges Decl., Ex. B.)

Polaris moves to exclude the expert testimony of W. Christopher Bakewell related to his opinion on reasonable royalty damages for the '449 and '501 Patents. (Mot. to Exclude Expert Test. of W. Christopher Bakewell, July 20, 2018, Docket No. 320, Case No. 15-4475.) Bakewell is a Managing Director of Duff & Phelps, LLC, an international consulting firm specializing in financial advisory services. (Decl. of Samuel T. Lockner ("Lockner Decl.") ¶ 3, July 20, 2018, Docket No. 324, Case No. 15-4475; Ex. B ("Bakewell Report") ¶ 7, July 20, 2018, Docket No. 326, Case No. 15-4475.) At Duff & Phelps, LLC Bakewell's primary responsibility is to provide consulting services involving valuation and related issues in connection with technology-rich businesses and intellectual property. (Bakewell Report ¶ 7.)

Bakewell used a two-step analysis to form his opinion on reasonable royalty damages. (*Id.* ¶¶ 204.) First, Bakewell used three intellectual property valuation methodologies to determine a baseline of valuation for the patents-in-suit. (*Id..*) These

methodologies include (1) the market approach, (2) the income approach, and (3) the cost approach. (*Id.*) Second, Bakewell analyzed qualitative factors known as the *Georgia-Pacific* factors. (*Id.* ¶ 5.)

The market approach values assets based on comparable arm's-length transactions between unrelated parties. (*Id.* ¶ 209.) Under this methodology, Bakewell considered agreements between Polaris and third parties, and Arctic Cat and third parties. (*Id.* ¶¶ 216-89.) Bakewell determined that agreements between Polaris and Vaughn North ("North Agreement"), and Polaris and CFMOTO ("CFMOTO Agreement") were comparable to a hypothetical license between Polaris and Arctic Cat for the '449 and '501 Patents from a technical and economic standpoint. (*Id.* ¶¶ 218, 280.)

The North Agreement ███████████████████████████████████████ Bakewell based his opinion that the North Agreement is comparable to the hypothetical license at issue on several factors. First, ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ (*Id.* ¶ 220.) ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ (*Id.* ¶ 226.) Third, ████████████████████████████████████████████████████████████ and explained why he still considered the North Agreement comparable despite this fact. (*Id.* ¶ 228.)

The CFMOTO Agreement ███████████████████████████████

███████████████████████████████████████ (*Id.* ¶ 239.)

Bakewell based his opinion that the CFMOTO Agreement is comparable to the license at issue on several factors. First, ██████████████████████

████████████████████████████████████████████████████

████████████████ Second, █████████████████████████

████████████████████████████████████████████████████

██ Third, ███████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████ Fourth, ██████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████ (*Id.* ¶¶ 238-39, 262-64.) Fifth, ██████

████████████████████████████████████████████████████

██████ (*Id.* ¶¶ 266-75.) ███████████████████████████

The income approach involves analyzing the incremental value of the economic benefits associated with the '449 and '501 Patents. (*Id.* ¶ 318.) Bakewell opined that the '449 and '501 Patents had little value under this approach. This conclusion is based on both patents relating to features rather than to the entirety of the accused Arctic Cat products and the fact that next-best alternatives exist for both patents. (*Id.* ¶ 320.) Bakewell also relied on discussions with Dr. Greg Davis, Arctic Cat's technology expert, regarding the benefits and uses of each patent. (*Id.* ¶¶ 45-49, 57, 59-60.)

The cost approach involves estimating the costs associated with creating the assets at issue, or an acceptable substitute. (*Id.* ¶ 292.) Bakewell opined that inexpensive non-infringing alternatives for the '449 and '501 Patents exist. (*Id.* ¶¶ 182-85, 313-14.) To reach this conclusion, Bakewell relied on a Polaris expert's opinion that ███████████████████████████████████████████████████ For the '501 Patent, Bakewell relied on Dr. Davis's expert opinion that the air inlet could be moved without impact on the performance of the accused vehicles. (*Id.* ¶¶ 182-85.) Further, because the air inlet could have been moved when the accused vehicles were first designed, Bakewell opined that the new design would have incurred no incremental cost. (*Id.* ¶¶ 315-16.)

Bakewell used the valuations he found through the market, cost and income approaches to establish baseline values for the '449 and '501 Patents and create the table below. (*Id.* ¶¶ 322-23.)

**Summary of Baseline Royalty Data Points**
**Life of Patent Amounts**[597]



| Description | '449 Patent | '501 Patent | Lump-Sum Total |
|---|---|---|---|
| **Market Approach** | | | |
| 2013 North – Polaris Agreement | | | |
| 2016 Polaris – CFMOTO Agreement | | | |
| **Cost Approach** | | | |
| **Income Approach** | | | |
| **Baseline Royalty** | | | |

(*Id.*)

Bakewell also opined that the total lump-sum royalty would not exceed ▮▮▮. (*Id.*) Bakewell allocated to the '449 Patent the baseline royalty of ▮▮▮, and to the '501 Patent ▮▮▮ (*Id.*) The allocation was made, in part, based on the weight that Polaris's damages expert, Dr. Timothy J. Nantell, assigned to each patent. (Decl. of Maria Elena Stiteler ("Stiteler Decl.") ¶ 4, Aug. 16, 2018, Docket No. 385, Case No. 15-4475; Ex. 3 at 13, Aug. 16, 2018, Docket No. 388, Case No. 15-4475.) The value of the '449 Patent is also equivalent to the value derived from the cost approach—▮▮▮ for a design around. (*Id.* at 12.) After establishing this baseline, Bakewell also considered the *Georgia-Pacific* factors. (Bakewell Report ¶ 325.)

## DISCUSSION

### I. STANDARD OF REVIEW

Federal Rule of Evidence 702 governs the admissibility of expert testimony and provides the following:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and

>   (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The district court has a gate-keeping obligation to make certain that all testimony admitted under Rule 702 satisfies these prerequisites and that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). The proponent of the expert testimony has the burden of establishing by a preponderance of the evidence that the expert is qualified, that his or her methodology is scientifically valid, and that "the reasoning or methodology in question is applied properly to the facts in issue." *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757-58 (8th Cir. 2006).

"[T]he trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999). However, the Eighth Circuit has held that "[c]ourts should resolve doubts regarding the usefulness of an expert's testimony in favor of admissibility." *Marmo*, 457 F.3d at 758. "As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Loudermill v. Dow Chem. Co.*, 863 F.2d 566, 570 (8th Cir. 1988). "Only if [an] expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." *Hose v. Chi. Nw. Transp. Co.*, 70 F.3d 968, 974 (8th Cir. 1995).

## II. BAKEWELL'S REASONABLE ROYALTIES OPINION

Polaris points to three reasons why Bakewell's testimony on reasonable royalties should be excluded. First, Polaris alleges that Bakewell failed to explain the basis for his affirmative lump-sum royalty opinion. Second, Polaris argues that Bakewell's reliance on the North and CFMOTO Agreements is unreliable. Third, Polaris argues that Bakewell's reliance on the *ipse dixit* of Dr. Davis renders certain data points unreliable.

### A. Lump-sum Royalty Opinion

In *Exmark Manufacturing Company Inc. v. Briggs & Stratton Power Products Group, LLC*, the Federal Circuit held that it was "not enough for an expert to simply assert that a particular royalty rate is reasonable in light of the evidence without tying the proposed rate to that evidence." 879 F.3d 1332, 1351 (Fed. Cir. Jan. 12, 2018). There, the expert analyzed the *Georgia-Pacific* factors in light of the facts, but "plucked the 5% royalty rate out of nowhere." *Id.* The court, thus, held that the district court erred by not excluding the expert opinion. Polaris argues that because Bakewell failed to tie his lump-sum royalty figure to the evidence and did not explain how he reached the final figure of "no greater than $1 million," his testimony should be excluded.

Bakewell supports his lump-sum royalty figure by creating a baseline using six data points. Each data point is sufficiently grounded in facts. Bakewell relied on evidence, including ready substitutes, expert opinions from Polaris and Arctic Cat, the North and CFMOTO Agreements, and competitive assessments.

Although Bakewell does not specifically tie any evidence to the ▮▮▮▮ figure in the section where he concludes that the lump-sum royalty should be ▮▮▮▮▮▮ ▮▮▮▮ Bakewell does note differences between the CFMOTO Agreement and the instant case that may justify a figure ▮▮▮▮▮▮ the CFMOTO Agreement's ▮▮▮▮▮▮ ▮▮▮▮▮▮ For instance, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Also, part of the value of the CFMOTO settlement was accounted for ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ Thus, Bakewell's opinion is grounded in enough facts to allow him to testify at trial because his opinion would be helpful to the jury. That Bakewell failed to specifically identify how he got from ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ is appropriate for cross-examination, not exclusion of testimony.

Second, Polaris argues that Bakewell's allocation of value among the '449 and '501 Patents is not based on the facts of the case. Bakewell does not form his own opinion on the allocation of value. Instead, he relies on the allocation that Dr. Nantell makes, ▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Bakewell stated in his deposition that he disagrees with Dr. Nantell's allocation of value, but nevertheless relied on it. Polaris argues that Bakewell should not be allowed to testify to an opinion that he does not believe.

Arctic Cat argues that experts can rely on the opinion of other experts. *See Arctic Cat Inc. v. Bombardier Recreational Products Inc.*, 876 F.3d 1350, 1369-70 (Fed. Cir. 2017). While true, this does not address Polaris's argument that Bakewell should not be allowed to testify to an opinion he does not hold. While it seems contrary to allow an

expert to testify to an opinion that he does not hold, where he relies on the opinion of another expert, that opinion may nonetheless be grounded in sufficient facts. An opinion based on that opinion may, in turn, be helpful to the jury. Unless Polaris is arguing that the opinion of its own expert, Dr. Nantell, is not sufficiently grounded in facts, the Court sees no reason to exclude Bakewell's opinion based on his reliance on Dr. Nantell's opinion.

### B. Comparability of North and CFMOTO Agreements

#### 1. North Agreement

Polaris next challenges Bakewell's reliance on the North and CFMOTO Agreements. Bakewell relies on the North (and CFMOTO) Agreement to determine the terms of a hypothetical license agreement between Polaris and Arctic Cat for the allegedly infringed patent. This hypothetical license is derived from *Georgia-Pacific* factor fifteen. That factor

> evaluates the royalty that a licensor (such as the patentee) and licensee (such as the infringer) would have agreed upon if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee—who desired, as business proposition, to obtain a license to manufacture and sell a particular article embodying the intellectual property—would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent licensor who was willing to grant a license.
>
> (Bakewell Report at 125 n. 644.)

Polaris argues that the North Agreement is not comparable to the instant case, and thus, Bakewell's reliance on it warrants the exclusion of his testimony on the issue.

In *LaserDynamics, Inc. v. Quanta Computer, Inc.*, the Federal Circuit reversed an order of the district court where the court, through a motion in limine, allowed a settlement agreement to come in as evidence. 694 F.3d 51, 77 (Fed. Cir. 2012). There, the settlement agreement was used to prove the amount of a reasonable royalty. *Id.* In reversing, the Federal Circuit stated,

> The notion that license fees that are tainted by the coercive environment of patent litigation are unsuitable to prove reasonable royalty is a logical extension of *Georgia-Pacific*, the premise of which assumes a voluntary agreement will be reached between a willing licensor and a willing licensee, with validity and infringement of the patent not being disputed.

*Id.*

Several differences exist between *LaserDynamics* and this case. First, Arctic Cat is not seeking to admit the North Agreement into evidence. Bakewell relies on the North Agreement to form his opinions, but Arctic Cat does not, at this time, seek to introduce it into evidence. Second, *LaserDynamics* analyzed the settlement agreement in the context of Federal Rules of Evidence 403 and 408 as opposed to the analysis here under 702. The *LaserDynamics* court viewed the use of the settlement in that case with suspicion because "'it was the least reliable license [in the record] by a wide margin,'" and there were twenty-nine other licenses in the record that were far more reliable. *Id.* at 77-78. While *LaserDynamics* informs whether Bakewell relied on sufficient facts, it does not control whether Bakewell may rely on the North Agreement.

Although settlement agreements are not an ideal proxy for royalty payments, other courts have recognized that such agreements may be used. In *Comcast Cable Communications, LLC v. Spring Communications Company, LP*, the court distinguished *LaserDynamics* because the settlement agreement had been entered into evidence at trial. 218 F. Supp. 3d 375, 385 (E.D. Pa. 2016). Here, as in *Comcast*, an expert relies on the settlement agreement in forming their opinion, and the parties are not seeking to admit that agreement into evidence. *Id.* As noted in *Comcast*, even if the settlement agreement itself were inadmissible evidence, "Federal Rule of Evidence 703 permits an expert . . . to rely on inadmissible evidence if experts in the field would reasonably rely on such evidence." *Id.* Because Bakewell reasonably relies on the North Agreement to form his opinion, it is admissible. *See* Fed. R. Evid. 703.

Polaris also argues that Bakewell cannot rely on the North Agreement because it is not comparable to the instant case for two reasons: (1) the North patents cannot be presumed valid and enforceable, thus it is possible that the settlement was a nuisance payment; and (2) North was an NPE.

Polaris argues that Arctic Cat cannot show comparability because to be comparable, the patents at issue must be able to be presumed valid and enforceable. *LaserDynamics*, 649 F.3d at 77. When North sued Arctic Cat under the same patents as those asserted against Polaris, Arctic Cat took the position that the asserted patents were invalid and unenforceable. ████████████████████████████████████████████████████████████████████████████████████████████████

Polaris also argues that the North Agreement is not comparable because North was an NPE and was thus materially different from Arctic Cat, a head-to-head competitor. *Sprint Communs. Co. L.P. v. Comcast IP Holdings, LLC*, 2015 U.S. Dist. LEXIS 10838, at *3 (D. Del. Jan. 20, 2018) ("The agreement, however, was the result of a settlement between Comcast and a non-practicing entity, meaning that there were likely major economic differences between the negotiating parties."). Although that court noted this difference, it did not discuss the effects of settlements with NPEs on comparability. Because these differences have not been held by the Federal Circuit as a bar to admissibility, this Court declines to do so here.

Lastly, the question of comparability goes to weight, not admissibility. *Apple, Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1327 (Fed. Cir. 2014) ("Here, whether these licenses are sufficiently comparable such that Motorola's calculation is a reasonable royalty goes to the weight of the evidence, not its admissibility.") (overruled on other grounds). Bakewell's opinions have met the Rule 702 requirements for admissibility, and Polaris's arguments go only to the weight of the evidence. Thus, the Court will deny Polaris's motion on this ground.

### 2. CFMOTO Agreement

Polaris makes similar arguments regarding Bakewell's reliance on the CFMOTO Agreement. As a general rule, courts frown on the use of settlements to prove the amount of damages in a patent case. *LaserDynamics*, 694 F.3d at 77. However, where agreements are reached at the end of trial, before closing arguments and jury deliberations, courts have

affirmed the use of settlement agreements to prove damages. *See Prism Techs. LLC v. Sprint Spectrum L.P.*, 849 F.3d 1360, 1371 (Fed. Cir. 2017). Here, the CFMOTO Agreement was reached during litigation following significant fact discovery and issue of a claim construction order. Each parties' assessment of the case was likely enhanced because of the discovery and claim construction order. Thus, Bakewell's reliance on the CFMOTO Agreement despite it being reached during litigation is admissible, particularly because Arctic Cat does not seek to admit the Agreement itself into evidence.

Polaris also attacks the CFMOTO Agreement on the grounds that, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████ Thus, Bakewell's opinion is grounded in sufficient facts.

Any attacks on the comparability of the CFMOTO Agreement go to its weight, not its admissibility. Furthermore, ████████████████████████████████████

████████████████████████████████████████ Thus, the Court will deny Polaris's motion with respect to this argument.

### C. Ipse Dixit

Bakewell relies on several opinions of another Arctic Cat expert, Dr. Gregory Davis. Polaris attacks Bakewell's reliance on Dr. Davis' opinions because, Polaris argues, Dr. Davis' opinions are *ipse dixit*. Specifically, Polaris disputes Bakewell's reliance on Dr. Davis' opinion that a person could design around the '449 and '501 Patents without sacrificing performance or increasing costs. Polaris argues that this opinion is *ipse dixit* because Dr. Davis does not identify a specific design-around to support this opinion.

In *Uniloc USA, Inc. v. Microsoft Corp.*, the Federal Circuit held that a "patentee must 'sufficiently [tie the expert testimony on damages] to the facts of the case.'" 632 F.3d 1291, 1315 (Fed. Cir. 2011) (alteration in original) (quoting *Daubert*, 509 U.S. at 591). "Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the

expert." *General Elec. Co. v. Joiner*, 522 U.S. 512, 519 (1997).  Where the expert fails to connect the evidence to his or her opinion, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered," and exclude the opinion.  *Id.*

Here, Polaris failed to show that to have the proper support for his opinion, Dr. Davis must identify a specific design-around.  The only case Polaris cites for this argument is *Biscotti Inc. v. Microsoft Corp.*,  Case No. 2:13-cv-01015, 2017 U.S. Dist. LEXIS 94016, at *14 (E.D. Tex. May 25, 2017).  However, there are material differences between *Biscotti* and the instant case.  In *Biscotti*, the court excluded the testimony of two experts because they failed to provide a basis for their opinions that several patents were technically and economically comparable to the patent at issue.  *Id.* at *11-14.  The court identified several differences between the patent at issue and the patents being compared to it, including that the patents were for technologies that were used in different fields, and that the licenses associated with those patents were granted from an organization whose mission was to provide an open, fair, reasonable, and non-discriminatory licensing program, as opposed to a competitor.

In this case, Dr. Davis sufficiently supported his conclusion that design-arounds for the '449 and '501 Patents would not increase costs or decrease performance.  Dr. Davis opined that there were relatively few positions to mount a sway bar and that a person of ordinary skill in the art would have been aware of these few positions, as evidenced by prior patents.  (Lockner Decl. ¶ 9, Ex. H ¶¶ 161-63.)  Dr. Davis opined that prior patents would have shed light on the benefits of certain positions for sway bars, and as such,

persons of ordinary skill would have sought to modify the sway bars. (*Id.* ¶ 165.) Although Dr. Davis acknowledged that tradeoffs existed with different positions of the sway bar, this goes to the weight of his opinion on costs of implementing design-arounds rather than admissibility. (*Id.* ¶ 335.) Dr. Davis supported these conclusions by citing several prior patents (Kobayashi, Reynolds, Gradu, etc.) that showed rear mounted sway bars which a person of ordinary skill in the art could review and modify to create a design-around. (*Id.* ¶ 336.) Dr. Davis makes similar conclusions regarding air inlets—that placement is largely a design choice even though tradeoffs may exist. (*Id.* ¶¶ 1057-58.) Dr. Davis cites prior patents to show that conventional wisdom at the time of the invention supported various positions of air inlets and that using side air inlets had been done before. (*Id.* ¶¶ 1058-59.)

Although Dr. Davis does not identify his own design-around, he has cited sufficient evidence and tied the evidence to the facts of the case. Dr. Davis discussed different prior patents and how they disclose similar technology used in side-by-side all-terrain vehicles that would, in his opinion, lead a person of ordinary skill in the art to create a design-around that would not decrease performance nor increase costs. He also tied this opinion to the facts of the case, specifically the '449 and '501 Patents and Arctic Cat's actual implementation of similar technology. Because Dr. Davis's opinions are properly supported and Polaris's arguments go to weight and not admissibility, the Court will deny Polaris's motion regarding this argument.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiff's Motion to Exclude Expert Testimony of Christopher Bakewell [Case No. 15-4129, Docket No. 212] is **DENIED**.

2. Plaintiff's Motion to Exclude Expert Testimony of Christopher Bakewell [Case No. 15-4475, Docket No. 320] is **DENIED**.

**IT IS FURTHER ORDERED** that the parties are to show cause on or before fourteen (14) days from the date of this Order why the Court should not unseal the Order and to specify any portion of the Order warranting redaction.

DATED: March 12, 2019　　　　　　　　　　　　　　　s/John R. Tunheim
at Minneapolis, Minnesota.　　　　　　　　　　　　　JOHN R. TUNHEIM
　　　　　　　　　　　　　　　　　　　　　　　　　　　　Chief Judge
　　　　　　　　　　　　　　　　　　　　　　　　United States District Court